MHλ

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

FILED
12-15-2010
DEC 15 2010 YM

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,
    Plaintiff-Respondent

Vs.

EDMUND J. LOPINSKI, JR.
    Defendant-Petitioner

No. 97 CR 165
James B. Zagel
Presiding Judge

**VERIFIED PETITION TO VACATE JUDGMENTS
OBTAINED BY FRAUD ON THE COURT IN THE
CAPTIONED CRIMINAL CASE**

    NOW COMES Petitioner EDMUND J. LOPINSKI, JR. ("Lopinski"), by his attorney Michael B. Cohen, and moves to vacate the judgments in this case because they were obtained by Fraud on the Court.

## Introduction

    1.   This motion addresses a massive fraud perpetrated on this Honorable Court, [and on the Court in the related civil case – 92 C 3289], by Officers of the Court, including Philip S. Wolin and his law firm, Wolin, Kelter & Rosen Ltd. ("Wolin"); Jerome Torshen, now deceased, and his law firm Torshen, Slobig, Genden, Dragutinovich & Axel Ltd. ("Torshen"); and Siegan, Barbakoff & Gomberg ("Siegan") and Kenneth Drost ("Drost"), and by numerous aiders, abettors, and fellow conspirators, including Steven Buckley ("Buckley"), Douglas Van Scoy ("Van Scoy"), Jeffrey McReynolds ("McReynolds") and Vincent Petrella ("Petrella"),

1

cumulatively, the "Fraud Perpetrators". The impact of this fraud has resulted in the loss of hundreds of millions of dollars of assets, principal and interest by numerous persons including Petitioner Lopinski and the 35,000 innocent investors of the Datronic Investment Partnerships who relied on the Federal Judicial System to protect their American rights and dreams to fair play and just treatment concerning their investments.

2.  As disclosed herein, a litany of false disclosures were made to this Court, to the Court in case 92 C 3289, to the representatives of the United States Justice Department ("Justice Department") and to their independent expert witness firm, Kroll Associates, by the Fraud Perpetrators.

3.  One of the primary fraud on the court schemes of the Fraud Perpetrators was to financially manipulate the records of Lopinski's company, Datronic Rental Corporation, ("Datronic"), to cause it to appear that Datronic had been over reimbursed by the investment partnerships it managed. McReynolds was instrumental in this financial manipulation, as he provided assistance to the Kroll Associates, the expert witness for the Justice Department. The Kroll Associates report, which prominently disclosed McReynolds assistance, falsely accused Lopinski of receiving $9.1 Million of excess reimbursements from the investment partnerships. The false claim of excess reimbursements by the Fraud Perpetrators was made and used against Lopinski as evidence of his purported intention to misappropriate funds from these investment partnerships, and also made and used against Price Waterhouse, the independent auditor for Datronic and the investment partnerships, for the purpose of suing them and extracting massive and undeserved legal fees.

4.   Another of the Fraud Perpetrators' fraud on the court schemes was to fabricate a summary of damages allegedly caused by Lopinski, Price Waterhouse and others. Fraud Perpetrator Torshen presented this fabricated summary of damages, in the amount of approximately $100 million, which included the excess reimbursement claim addressed in Par. 3 above, to a representative of the Justice Department, AUSA Buchman, in Judge Zagel's courtroom. This summary of damages was proven false by Price Waterhouse in their state trial and, substantially proven false by Defendant Lopinski in this case.

5.   Another of the Fraud Perpetrators' fraud on the court schemes was to retroactively reverse previously issued legal opinions issued by Siegan and Drost regarding purchase discounts and security deposits. In a subsequently issued "Internal Investigation" prepared by Siegan, which was supplied to the Justice Department and this Court via Defendant Lopinski's indictment, Siegan accounted for the funds related to these purchase discounts and security deposits as misappropriations.

6.   Substantial financial benefits were derived by these Fraud on the Court Perpetrators. Torshen and Wolin wrongfully represented to the Court in 92 C 3289 that they had recovered assets from Defendant Lopinski when, in fact, these assets had already been assigned to an independent trust by Lopinski to pay any of his real, verified and audited obligations. Fraud Perpetrators Torshen and Wolin applied to the Court for and were paid a $5.75 million legal fee as a result of these false representations and they were then paid an additional and approximate $10 million in legal fees for numerous lawsuits they filed, which resulted in the recovery of only a fraction of the legal fees they were paid. Fraud Perpetrators Buckley, Drost and

Van Scoy formed a company, New Era, which was paid almost $35 million in management fees. These legal and management fees could have only been paid through the fraudulent elimination of key provisions in the investment partnership contracts by the Fraud Perpetrators (See Par. 7 below). These fees resulted in real and substantial losses to the investment partnerships.

7. During the defense launched by Price Waterhouse and Lopinski concerning the false claims by the fraud on the court perpetrators, Fraud Perpetrator Buckley, and others, including Torshen, schemed to alter the original contracts executed by Datronic with the investment partnerships. Key contractual provisions regarding the disbursal of fees by the investment partnerships (the "asset test") and the preferential distribution of funds at the termination of the investment partnerships (the "liquidating preference") were fraudulently eliminated or ignored. To accomplish this objective, the investment partnership representatives were contacted by Buckley, and others, and deceived as to the true motivations of the Fraud Perpetrators in eliminating or ignoring these key provisions. In written correspondence, Buckley portrayed the elimination of these key provisions as a requirement for a successful management of the investment partnerships and that the elimination would **"insure that investors will receive back their original investments plus positive yields"**. Fraud Perpetrator Torshen represented to the Court in 92 C 3289 that the continuing limited partners (who agreed to the elimination of these key contractual provisions) were **"guaranteed payments of 11% of their capital account"** which would **"include both the return of principal and interest"**.

8. **Fraud Perpetrators Buckley and Torshen's statements and representations addressed in Par. 7 above were false.** The

4

elimination of these key contractual provisions was financially catastrophic for the investment partnerships, a fact easily foreseen by these fraud perpetrators. After causing the elimination of these key provisions, the fees and expenses (including massive and unwarranted legal, management and other fees) sky rocketed to unprecedented amounts resulting in the investment partnerships losing almost $83 Million of their investment and never receiving any of the $250 million in approximate yields associated with their investment. While the investment partnerships were in the process of losing these substantial amounts, the Fraud Perpetrators were reaping vast financial rewards which would have been prohibited under the provisions of the original partnership contracts executed by Petitioner Lopinski and his company, Datronic. This fraud has gone undetected due to the sophisticated methods used by the Fraud Perpetrators in covering up their fraudulent activities and due to their failure to provide the documentation requested by the Justice Department in their "blanket" subpoenas.

9. Similar to the assistance Fraud Perpetrator McReynolds provided the Justice Department expert Kroll Associates, McReynolds assisted the expert witness, who testified against Price Waterhouse in the Circuit Court of Cook County law suit. Price Waterhouse was ultimately successful in defending against these false claims made, both in Case 92 C 3289 and subsequently in Circuit Court of Cook County case 1995 L 017447.

10. Petitioner Lopinski and his expert witness firm, American Express Tax and Business Services Inc., were also successful in defending against $9.1 million of excess fees falsely claimed in the Kroll Report, and placed therein as a result of the false statements provided to Kroll Associates by

Fraud Perpetrator McReynolds. The remaining $5.3 million of excess reimbursements, which were ruled to be misappropriations in this case, were the same product of fraudulent misrepresentations made to the Justice Department and this Honorable Court by the Fraud Perpetrators of the Fraud on the Court.

11.     Petitioner Lopinski has spent thousands of hours visiting the Federal Archives Warehouse, examining and accumulating evidence of this Fraud on the Court allegations, and analyzing the data obtained. He has also made Freedom of Information Requests for information supporting his claims and, through his attorney, sent certified information requests to Kroll Associates and their expert, Dr. Frank Nasuti, and to one of the AUSA'S responsible for petitioner's case. Petitioner has been refused requested necessary confirmatory information, or has been otherwise unsuccessful in obtaining it without assistance from this Court to compel its disclosure and delivery to the Petitioner. Petitioner has calculated the dollar effect of the error made in the Kroll Report, which was prepared with Fraud Perpetrator McReynolds assistance, and has discovered that the funds charged as misappropriations in this case were actually due him and his company, Datronic, as demonstrated hereinafter.

## Petitioner Lopinski's Claims

12.     The Fraud Perpetrators committed a Fraud on this Court in Case 97 CR 165. Their fraud substantially adversely impacted Petitioner Lopinski's criminal case herein and the resultant false and unjust Judgments made.

6

13.   Substantial evidence exists and has been accumulated by Petitioner which confirms and establishes his claim herein, including affidavits, testimony excerpts, documentation and the petitioner's analysis of the Kroll expert witness report, submitted to the Plaintiff – Respondent, that the Fraud Perpetrators successfully schemed to effect the Fraud on the Court alleged herein.

14.   The Fraud Perpetrators had a common objective to eliminate the petitioner (and numerous other officers and employees) from the management of Datronic. It was their intent to remove any obstacles in their path to the hundreds of millions of dollars of funds and assets of Datronic, its managed investment partnerships, its shareholders, Computer Rental Corporation of America, Inc. (CRCA), its shareholders, and other individuals, for unlawful conversion purposes.

15.   To achieve their objective of converting multi millions of dollars from the managed investment partnerships to their own accounts, the fraud perpetrators fraudulently removed a key "spending cap" provision from the agreements executed with the managed investment partnerships (the Asset Test). When questioned about this intended removal, **(Exhibit 1 - Affidavit and attached letters from Linda L. Ingle, J.D. and President, Aegis Investments)**, Fraud Perpetrator Buckley, represented that such elimination would have a positive impact on investor equity and that this elimination would "insure" that "investors will receive back their original investment plus positive yields" **(Exhibit II attached to Exhibit 1)**. On March 4, 1993, Fraud Perpetrator Torshen, one of the class action attorneys in the civil case and an officer of the court, represented to the Court in case 92C3289 that the continuing limited partners [who agreed to the removal

7

of this key provision] were <u>guaranteed payments of 11% of their</u>
<u>capital contribution</u>, such payment to include the return of
<u>principal and interest</u> **(Exhibit 2 – Torshen guarantee Pg. 6 Lines
5-8)**.

16. These representations were false when made and either
known to be false or made knowing there was no basis for their
assertions other than to get Lopinski out of the way so that
Datronic and the limited partnerships of which it was a general
partner could be looted by the Fraud Perpetrators and to the
detriment of Lopinski and the limited partners. The investment
partnerships received no interest or positive yield on their
investment and a substantial amount of their investment was lost
as shown by Table 1:

**Table 1**

|  | Funds Raised * | Cumulative Distributions 1987-2001 * | Investor Gains (Losses) |
|---|---|---|---|
| Fund XVI | $49,946,500 | $42,915,569 | ($7,030,931) |
| Fund XVII | $99,999,500 | $84,141,587 | ($15,857,913) |
| Fund XVIII | $99,988,500 | $75,180,923 | ($24,807,577) |
| Fund XIX | $99,879,500 | $84,372,019 | ($15,507,481) |
| Fund XX | $37,748,000 | $25,405,367 | ($12,342,633) |
| FIFI | $29,117,000 | $21,927,191 | ($7,189,809) |
| Totals | $416,679,000 | $333,942,656 | ($82,736,344) |

* Source: 10Ks filed with the Securities and Exchange Commission

17. The fraudulent removal of the key "spending cap"
provision was done through a negative voting scheme whereby non-
responders were deemed to be voting for the removal. Substantial
misinformation and representations, such as principal and
interest guarantees (See Par. 15 above), were simultaneously
provided to the investment partnership representatives and the
Court to mislead them as to the true intentions of the Fraud
Perpetrators and to cause these representatives and the Court to

allow for the key provision removal without challenge. The removal of this key provision allowed for unencumbered access to the funds and assets of the managed investment partnerships. Fees and expenses, as a percentage of partnership equity, paid to the new managers and others, including Torshen and Wolin "sky rocketed" to unprecedented amounts as a result as shown in Table 2:

## Table 2

| Time Period** | General Partner of Partnerships** | Fees as a % of Net Investor Capital** |
|---|---|---|
| 1987 N/A Start Up | Datronic/Lopinski | Not applicable |
| 1988 | Datronic/Lopinski | **$69 mil/1.9% *** |
| 1989 | Datronic/Lopinski | **$156 mil/1.8%** |
| 1990 | Datronic/Lopinski | $196 mil/1.8% |
| 1991 pre transfer | Datronic/Lopinski | $222 mil/7% |
| 1992 | LRC/New Era as of 5/1/92 | $208 mil/7.1% |
| 1993 | LRC/New Era | **$155 mil/12%** |
| 1994 | LRC/New Era | $103 mil/15.2% |
| 1995 | LRC/New Era | **$66 mil/20.1% *** |
| 1996 | LRC/New Era | $54 mil/25.6% |
| 1997 | LRC/New Era | $51 mil/16.4% |
| 1998 | LRC/New Era | $50 mil/16.4% |
| 1999 | LRC/New Era | $34 mil/15.5% |
| 2000 | LRC/New Era | $26 mil/26.5% |
| 2001 | LRC/New Era | $11 mil/49.7% |
| 2002 | LRC/New Era | Dissolved |

**\*\* Source: 10Ks filed with the Securities and Exchange Commission**

**\*\*\* The new managers charged 20.1% in Fees to manage $66 Million of Net Investor Capital compared to 1.9 % charged by Petitioner/Datronic to manage $69 Million**

18. The Fraud Perpetrators conspired to cause this fraud. Their schemes included destruction of substantial documentation during a Government investigation **(Exhibit 3 [Employee Affidavits])**, thereby failing to meet the "blanket provisions" of the Grand Jury Subpoenas issued by the Justice Department. A litany of false information was then supplied to the Government

in the form of perjuries during depositions and interviews, false financial reporting in 10K's, 10Q's and 8K's, and other documents provided to the Securities and Exchange Commission, the Justice Department attorneys and other Federal investigators.

19. Datronic's computer records and reports were fraudulently altered by Fraud Perpetrator McReynolds, who was Datronic's controller, and by Fraud Perpetrator Van Scoy, who was Datronic's CFO **(Exhibit 4 – Par. 8-11 [Chief Datronic Paralegal Fredericksen Affidavit])**.

20. Fraud Perpetrators McReynolds, Van Scoy and Petrella, Datronic's treasurer, and others schemed to alter other reports falsely claiming that Lopinski and Datronic had been over reimbursed by the Investment Partnerships. These false claims were communicated to the U.S. Attorney's Office, to the independent expert witness utilized by the U.S. Attorney's Office, to the court in Price Waterhouse's trial in State Court, and to this Honorable Court via Defendant Lopinski's indictment.

21. The U.S. Attorney's Office, and its representative AUSA J. Buchman, were also victims of the fraud perpetrated on this Court. Fraud Perpetrator Torshen presented a false report of damages, **(Exhibit 5 [False Summary of Damages])**, to AUSA Buchman, and hence to the Court. This report claimed that Lopinski and Datronic had derived excess reimbursements from the Investment Partnerships of approximately $35.881 million with total damages and interest losses of $98.28 million **(Exhibit 5)**.

22. The U.S. Attorney's Office and AUSA Buchman hired an Expert Witness to investigate the claim of excess reimbursement. Their expert's report letter states that Fraud Perpetrator

McReynolds provided assistance to this expert **(Exhibit 6 [Kroll Report Letter; Par. 2 and 3])**. On the basis thereof this expert charged Lopinski and Datronic with deriving excess reimbursements of approximately $9.1 million from the investment partnerships **(Exhibit 6; Par 3),** claiming that there was a limit of the amount of reimbursements which the investment partnerships could make.

23.     This charge was challenged by Defendant Lopinski's expert witness. An AUSA assigned to the criminal case informed Lopinski and his attorney that the expert witness for the U.S. Attorneys Office agreed with Lopinski's expert and that further information would be provided. This AUSA then left the U.S. Attorney's Office for private practice and this further information was never received.

### Basis of Funds due Petitioner
### And his Company

24.     In September 1991, Fraud Perpetrator Van Scoy gave a report to Lopinski which indicated the managed investment partnerships owed him and Datronic approximately $3.257 Million for expenses advanced **(Exhibit 7 – Actual/Forecast Reimbursable Expenses- YTD 9/91 Column).**

25.     In December 1991, Fraud Perpetrator Van Scoy gave a report to Lopinski claiming the managed investment partnerships would owe Lopinski and Datronic $4.113 million as of Dec. 31, 1991 **(Exhibit 7).**

26.     On March 30, 1992, Lopinski received a hand written note and summary from Fraud Perpetrator Petrella, **(Exhibit 8 – GP Administrative Expense Carryover)** claiming that Lopinski and

Datronic had been over reimbursed $17,018 by the managed investment partnerships and that the carryover at Dec. 31, 1991 was millions of dollars less than reported by Fraud Perpetrator Van Scoy **(Exhibit 7 and 8)**. Petitioner Lopinski requested that Fraud Perpetrator McReynolds verify these calculations. On April 22, 1992, Fraud Perpetrator McReynolds claimed that the report **"looks ok to me"** and initialed it **(Exhibit 9 - McReynolds Approval of Petrella Report)**. However, that exhibit upped the over reimbursement to $663,000.

27. When questioned as to their involvement and responsibility concerning the preparation of these reports of funds paid and/or due Lopinski and Datronic from the managed investment partnerships, the following responses were made:

- McReynolds claimed several times he could not recall who did these calculations and "thought" Petrella had done them at one point in time **(Exhibit 10 - Excerpts of SEC Interview of McReynolds)**;
- Petrella claimed William Krueger "was in charge of calculating the amounts needed to run the funds" **(Exhibit 11 - Page 4 of U.S. Attorney's Office Interview of Petrella)**. Petrella subsequently contradicted himself in a U.S, Attorney's interview, and stated that the report numbers (Exhibits 8 and 9) were provided to him by Fraud Perpetrator Van Scoy.
- William K. Krueger stated that "For the quarter ended June 30, 1991 and for the quarters thereafter, my responsibility to calculate this reimbursement due Datronic from the Public Funds was assigned to Douglas Van Scoy, Datronic's Chief Financial Officer and to

Vincent Petrella, Datronic's Assistant Treasurer"
**(Exhibit 12 - Par. 6 of Affidavit of William W. Krueger)**

28.  False claims of excess reimbursements were also made against Price Waterhouse, the independent auditor for Petitioner's company, Datronic, and the managed investment partnerships. A law suit was filed against Price Waterhouse, **(Case No. 95 L 17447-Law Division of the Circuit Court of Cook County)**. In this suit, Price Waterhouse was accused by Gerald Hepp (Hepp), one of plaintiff's expert witnesses, with allowing Petitioner's company, Datronic to derive excess reimbursements of $19.5 million **(Price Waterhouse Trial Transcripts Page 2192)**. Hepp testified that he was assisted with his judgment and analysis by McReynolds **(Price Waterhouse Trial Transcripts Page 2299)**. Hepp made the same erroneous claim as the U.S. Attorney's expert witness report **(Exhibit 6)**; that the Datronic investment partnerships were limited to a maximum amount of expense reimbursements they could pay on an annual basis **(Price Waterhouse Trial Transcripts Page 2362)**. This charge was proven false by Price Waterhouse, their attorneys and their expert witnesses.

29.  This Honorable Court was also deceived regarding these excess reimbursements purportedly derived from the investment Partnerships. In Defendant Lopinski's case herein, the Court ruled that Lopinski had misappropriated $5.3 million of funds and assets belonging to the managed investment partnerships. Defendant Lopinski was ordered to repay these amounts, and was sentenced to an ultimate term of incarceration totaling 63 months and 36 months of supervised release. A summary of the assets and

restitution ordered by this Honorable Court is set forth in Table 3 as follows:

**Table 3**

| Asset | Funds Charged | Cost to Complete | Sales Proceeds | Restitution Ordered |
|-------|---------------|------------------|----------------|---------------------|
| Docks | $    216,000 | $ -- | $      45,000 | $ 171,000 |
| Yachts | $ 3,469,361 | $ 2,275,000 | $ 6,090,000 | $(345,639) |
| Jet | $    700,000 | $ -- | $ -- | $ 700,000 |
| Condo | $    955,000 | $ -- | $      762,000 | $ 193,000 |
| **Total** | **$ 5,340,361** | **$ 2,275,000** | **$ 6,897,000** | **$ 718,361** |

SOURCE: Court Transcripts for Case 97 CR 165, dated May 23, 2000 (Docket Entry 95-9)

30. Petitioner asserted throughout the criminal proceedings in this case and continues to assert herein and always that he is legally entitled to these funds. He has accumulated substantial evidence proving fraudulent deception and financial manipulation by Fraud Perpetrators. A calculation of the effect of the proven errors made by the two expert witnesses, who were assisted by Fraud Perpetrator McReynolds with their reports, has been completed by Petitioner Lopinski. That amount combined with the amount calculated by Price Waterhouse as due from the managed investment partnerships for the CLIC expenses advanced by petitioner and Datronic indicates the following as set forth on Table 4:

**Table 4**

| Category | Funds Due Petitioner/Datronic |
|---|---|
| Funds Due Petitioner and Datronic after correction for error by Kroll Assoc.* | $    3,843,034 |
| Price Waterhouse calculation of funds due petitioner and Datronic for expenses advanced CLIC **(Ex. IV attached to Ex.12)** | $    1,931,326 |
| Total Funds Due Petitioner and Datronic | $    5,774,360 |
| Funds charged as misappropriations **(Table 3 Above)** | $    5,340,361 |

\* Correction of Kroll Report Errors by Petitioner and compared to 10K's issued by the Securities and Exchange Commission.

31.  At all times during the course of the proceedings in this case and at other times, Petitioner has maintained his innocence of any actions which involved a misappropriation of funds and assets of the investment partnerships managed by his company, Datronic.

32.  Petitioner was provided detailed and comprehensive reports that he was entitled to almost $6 million of reimbursements from the Managed Investment Partnerships and from Capitol Lease Investments Corporation and Gary Morgan (Morgan), which reports were destroyed and/or altered **(See Exhibits 3 and 4)** by the Fraud Perpetrators of the Fraud on this Honorable Court and the assets purchased were then charged in the civil case and this case as misappropriations.

## Other Substantiation of Petitioner's Assertion that Managed Investment Partnership Funds were not Utilized

33. At the time the funds summarized in Table 3 were utilized, petitioner was in possession of legal opinions (and subsequently received a legal memorandum) from Siegan, Datronic's securities attorneys. Fraud Perpetrator Drost was the Siegan partner in charge of the Datronic account.

34. Petitioner also received audit opinions from Weiss and Company (Weiss) (for 1989) and Price Waterhouse (for 1990). All of these opinions and memoranda support Petitioner Lopinski's assertion that $5 million of the funds utilized from the CLIC account at the Bank of California were not the property of the Investment Partnerships and were not misappropriations.

35. These legal opinions and memoranda were reversed by Siegan after Lopinski's voluntary resignation as an officer and director from Datronic. At the time of these reversals, Fraud Perpetrator Drost had left Siegan and joined Datronic, the petitioner's company, as general counsel. On information and belief, Fraud Perpetrator Drost was responsible for causing Siegan to reverse their previous legal opinions and memoranda. Lopinski was then falsely charged with having the intent to divert assets of the Investment Partnerships whereupon Fraud Perpetrators Drost, Van Scoy and Buckley formed a company, New Era, to manage the investment partnerships and paid approximately $35 million in fees.

## The Legal/Audit Opinions-Purchase Discounts

36.  In 1989, Siegan and Drost provided their legal opinion that a **purchase discount of $2.4 million on a purchase of $40 million of lease notes** by the Investment Partnerships from the Bank of California was properly retainable by the petitioner's company, Datronic **(Exhibit 13 [Siegan's 12/28/89 legal opinion])**. An updated opinion letter was issued on April 27, 1990 **(Exhibit 14 [Siegan's updated 4/27/90 legal opinion])**. This opinion letter was reviewed by Price Waterhouse in conjunction with their 1990 audit without exception **(See comments by Price Waterhouse manager Michael Kelly (MAK) (bate stamp PW 41756) on Exhibit 14)**.

37.  This $2.4 million transaction was audited by Weiss, the independent auditing firm for Datronic and the Investment Partnerships for 1989. The partner responsible for this audit, Robert Block, testified in the Price Waterhouse law suit that he had also obtained a legal opinion from the law firm of Fishman and Merrick, which supported the opinion of Siegan and Drost **(Price Waterhouse Trial Transcripts Page 884)**. Weiss then issued their audit opinion which supported the retention of this $2.4 million purchase discount.

38.  In conjunction with CLIC and Morgan's acquisition of the Leasefirst Portfolio, another **purchase discount was obtained equal to $2.659 million on a portfolio purchase of $40.25 million (Exhibit 15 [excerpt of Leasefirst purchase documents])**. This purchase discount was deposited into the CLIC account at the Bank of California.

39. At the time of the deposit, Petitioner Lopinski was in possession of the previous Siegan legal opinions and Weiss and Price Waterhouse audit opinions which supported a purchaser's retention of purchase discounts obtained. Petitioner believed the use of $2.659 million of purchase discounts obtained on the Leasefirst portfolio was not a diversion of investment partnership funds, as confirmed by these previous professional opinions.

### Siegan Legal Memorandum-Security Deposits

40. Petitioner Lopinski received a legal memorandum from Siegan on April 17, 1992 **(Exhibit 16 [Siegan 4/17/92 Legal Memorandum])**, which addressed $2.4 million (approx.) of security deposits received by CLIC and Morgan in conjunction with their acquisition of the Leasefirst Portfolio.

41. In paragraph 2 of page 2 of this legal memorandum, Siegan stated that the retention of security deposits (and corresponding cash) was legal and proper and these funds were not the property of the managed investment partnerships and should remain with CLIC.

42. Approximately $2.4 million of security deposits were tendered to CLIC and Morgan in conjunction with the purchase of the Leasefirst portfolio and deposited in the CLIC account at the Bank of California **(Exhibit 17 [$2.382 million of Security Deposits])**.

43. Third party obligations, such as these security deposits, assumed by the portfolio purchaser were not the property of the investment Partnerships and were the obligation

of the portfolio purchaser, as iterated in the 4/17/92 legal memorandum issued by Siegan. Accordingly, the use of $2.4 million of security deposits obtained on the Leasefirst portfolio was, not a misappropriation of investment partnership funds.

### Siegan Ignores Their Own Legal Opinions

44. On August 11, 1992, shortly after Petitioner's voluntary resignation from Datronic, Siegan issued a "Preliminary Report of Internal Investigation" of Datronic Rental Corporation, which stated a "principal source of diverted Partnership funds arose in connection with the acquisition of the LeaseFirst Portfolio" **(Exhibit 18 [Excerpt of Internal Investigation by Siegan])**.

45. Siegan also claimed that Petitioner caused the Partnership to "overfund" the Leasefirst transaction by $9 million **(Exhibit 18)**.

46. Testimony by Federal Agent, David M. Coleman, in Case 97 CR 165 proves the fallacy of this charge. He testified that $4 million (of this $9 million) was repaid to the Investment Partnerships in April, 1992 and that the CLIC loan was repaid (in full) by Datronic exercising their option to acquire the Leasefirst Portfolio **(Exhibit 19 Excerpts of Federal Agent testimony in 97 CR 165, Page 137)**.

47. The Siegan report completely ignored their own previous legal opinions concerning the remaining $5 million. The retention of $2.659 million of purchase discounts and the retention of $2.382 million of security deposits (total of $5.04 million) were classified in their legal opinions and memoranda as <u>not</u> being the

property of the managed investment partnerships. Siegan's reversal resulted in classifying this $5 million as an "overfunding". On information and belief and for fraudulent objectives, it was Fraud Perpetrator Drost who caused Siegan to reverse these legal opinions and memoranda to attempt to falsely show that Petitioner Lopinski misappropriated investment partnership funds.

## Boat Docks, Yachts and Jet Purchases

48.  The boat docks, yachts and jet purchases were made with funds from the CLIC account at the Bank of California with the knowledge and concurrence of Gary Morgan, CLIC's owner **(Exhibit 20 [Pg. 184 Lines 22-25 and Pg. 185 Lines 1-5; Excerpts of deposition of William Krueger])**.

49.  At the time of these purchases, Petitioner Lopinski was in possession of detailed reports indicating he was entitled to substantial funds due from CLIC and from the investment partnerships. These detailed reports were the basis for the purchase of these assets. On information and belief these reports were among those altered and the original reports were shredded by the Fraud Perpetrators of the Fraud on the Court **(Exhibit 3)**.

50.  Petitioner sought out these and other reports during a comprehensive examination of records in the evidence room (for this case) of the U.S. Attorney's Office and was unable to locate them. On information and belief, these reports were among the documents destroyed after petitioner's resignation of May 1, 1992 (See Par. 18 above).

### The Boat Docks

51. The $216,000 of boat docks, **(Table 1)** and **(Exhibit 21 [Purchase Documents for Boat Docks])**, were purchased from $1.427 million of funds transferred to Datronic's Dean Witter account from the CLIC account at the Bank of California on December 27, 1991 **(Exhibit 12 Par. 8-10 and Ex. 1-3 attached to Exhibit 12 [$1.427 million transfer])(Exhibit 20b Pg. 198 Lines 3-15)**.

52. These funds represented a partial repayment to Datronic from CLIC for $2.895 million of advances which <u>Datronic</u> (not the Managed Investment Partnerships) advanced to CLIC to pay their operational costs. This Repayment was calculated and verified by two separate officers of Datronic prior to this transfer being made **(Exhibit 12 - Par. 8-10)**. Price Waterhouse subsequently calculated that the Investment Partnership's were liable for this reimbursement amount **(Exhibit 12 – Exhibit IV Attached to Affidavit of William W. Krueger)**.

53. In the Siegan "internal investigation", a false accusation was made regarding the purchase of these boat docks, that it was a misappropriation by the petitioner **(Exhibit 22 [Excerpt of Siegan Report])**. It was also charged in the civil suit complaint in 92 C 3289 **(Exhibit 23 [excerpt of civil complaint; Pg. 27 i])**. The facts in Exhibit 12 prove that the petitioner and his company were legally entitled to these funds for the boat dock and it was not a misappropriation from the investment partnerships. The charges by the Fraud Perpetrators in the Siegan special report and in the civil case constitute fraudulent deception of the Court in Case 92 C 3289, which carried over into this Honorable Court.

## Payments for the Yachts and the Jet

54. The decision to purchase the yachts and the jet was made based on comprehensive reports provided to Lopinski by Fraud Perpetrator Van Scoy.

55. Since 1989, Datronic had been accumulating a substantial amount due from the investment partnerships which petitioner purposely allowed to accumulate for use when needed at some point in the future. As of December 31, 1989, this amount was approximately $1.8 million; as of December 31, 1990, some of this carry forward was used and it had decreased to $951,833; as of 3/31/91 it had again increased to approximately $2.5 million; on June 30, 1991, it had increased to approximately $3 million and as of 9/30/91, it had increased to $3.2 million **(Exhibit 12 - Par. 4-7 of Affidavit of William W. Krueger)**.

56. Petitioner proceeded to purchase the yachts, based on this reporting. In early December of 1991, he requested an update of this amount due. Fraud Perpetrator Van Scoy gave Lopinski a report on Dec. 13, 1991 stating that the receivable is further increasing to $4.113 million **(Exhibit 7)**. Petitioner continued making yacht payments and purchased a jet to be used in Datronic's & CRCA's business based on these reports provided.

57. In March/April of 1992, Fraud Perpetrator Petrella advised Petitioner Lopinski that Datronic no longer had any amounts due from the investment Partnerships **(Exhibit 8 - GP Administrative Expense Carryover)**. Fraud Perpetrator McReynolds was questioned about the report and approved it by initialing it **(Exhibit 9 - McReynolds Approval of Petrella Report)**.

58. Petitioner has since discovered that Petrella provided him with a false report. Based on information and belief and during questioning by the U.S. Attorney's office, Petrella acknowledged the report, but blamed the content on Fraud Perpetrator Van Scoy, stating that Van Scoy had supplied him with the amounts contained in it.

59. Petitioner has since recalculated the amount due from the investment partnerships and discovered that the eligibility for approximately $4 million due Datronic did not evaporate as represented by Fraud Perpetrators Van Scoy, Petrella and McReynold's **(Table 4 Above)**.

60. The March/April of 1992 report prepared, provided and/or approved by these parties is yet another example of fraudulent financial manipulations by these Fraud Perpetrators in their quest to eliminate Lopinski and other key officers and/or employees from the management of Datronic.

61. Petitioner, through Michael Cohen, his attorney, has contacted one of the AUSA's, (now in private practice), who was involved with petitioner's criminal case and has knowledge of this matter. This AUSA has declined to be interviewed except pursuant to either "(1)a demand made in accordance with 28 C.F.R. 16.21 et seq. or (2)a request made under the Freedom of Information Act" **(Exhibit 24 – AUSA Response Letter)**, therefore the aid of the Court will be required to elicit this information.

62. Petitioner believes that the testimony of this AUSA, combined with the testimony of the U.S. Attorney's Expert Witness, Dr. Frank Nasuti, along with supporting documents

requested but not produced will confirm Petitioner's claims herein and further prove the Fraud on the Court.

63. Most of the criminal case against Defendant Lopinski centered on the payments made for these yachts and the jet. The original reports supplied Lopinski initially by William Krueger and then by Van Scoy and Petrella through 12/13/91 were correct. Appropriate procedures verified their accuracy.

64. The March/April of 1992 reports supplied by Fraud Perpetrators Petrella and Van Scoy and approved by Fraud Perpetrator McReynolds were false. Lopinski's attempts to demonstrate that they were false, by independent audit by Robert Block of Philip Rootberg and Company, were thwarted by Fraud Perpetrator Van Scoy.

65. Petitioner has accumulated the necessary information proving his assertions that a Fraud on the Court has occurred in this case and in the related civil case. On information and belief, the additional testimony and record production of the U.S. Attorney's Office and its Expert Witness Firm, combined with the information already in the petitioner's possession, will fully demonstrate to this Honorable Court that petitioner was entitled to the funds used in Table 3 above and that he was not involved in any attempt to obtain investment partnership funds for which he was not 100% entitled to. Petitioner will further prove that these claims of over reimbursement, which resulted in petitioner's judgment of misappropriation, were based on the fraudulent motives and actions of the fraud perpetrators herein.

## Payments for the Condo

66. The purchase of the Lake Point Towers condo was made based on a June 26, 1991 stock sales agreement executed with Gary Morgan the owner of CLIC (Morgan). This stock agreement was required by Morgan as his incentive to continue to supply his monthly lease business to the Investment Partnerships. Morgan supplied petitioner with the agreement attached as **(Exhibit 25 – [Morgan Stock Sales Agreement])**.

67. Numerous Datronic officers were aware of this stock agreement **(Exhibit 26 [Excerpts of Depositions])**. During an SEC deposition, McReynolds even provided a hand written memorandum from Van Scoy indicating Morgan's entitlement to "40% of Datronic" **(Exhibit 27 [Van Scoy memorandum to McReynolds])**. McReynolds then requested "confidential treatment" of this memorandum, as his continued attempted act of deception and financial manipulation.

68. This condo purchase was made from the CLIC account at the Bank of California **(Exhibit 28 [Transfer for condo purchase])**. Morgan was fully aware of the transfer of funds for this condo. At the time of this transfer, $5.04 million of non-Investment Partnerships funds had been deposited into this CLIC account relating to the security deposits and purchase discounts addressed herein. The petitioner had legal opinions and a memorandum supporting the conclusion that these funds were not the property of the investment partnerships.

69. This transaction with Morgan would benefit the investment partnerships due to the continued flow of the Morgan/CLIC lease business. This lease business was approximately

$2 million a month and was an excellent investment opportunity which had an extremely positive impact on the investment partnerships.

70. The fraud perpetrators misrepresented Petitioner's intentions in this matter and falsely accounted for the condo purchase as a misappropriation by him.

## Conclusion

71. The fraud on this Honorable Court was a complete betrayal of legal and moral ethics by the Fraud Perpetrators. Their schemes and objectives were motivated by pure greed and not the "truth and justice" they attempted to portray. One of the Fraud Perpetrators (Buckley) stated to the CRCA owner that **"it is important that he (Buckley) maintain a squeaky clean image so he could come out of this looking like a white knight and could retain control of the funds" (Exhibit 29 [excerpt of Bullard Federal Interview]).** Petitioner has accumulated substantial proof that Buckley and other Fraud on the Court Perpetrators were not "squeaky clean", but were guilty of numerous instances of perjuries, frauds (some which extend back to their prior employments), and other malfeasance. Evidence indicates that Buckley, Van Scoy and Drost each had serious ethical problems with their prior employers. Buckley was sanctioned by the NASD for selling unauthorized securities. On information and belief, Buckley tried to conceal this fact by preparing and submitting fraudulent certifications of investor eligibility to the Katten Muchin law firm. Both Van Scoy and Drost were terminated for cause from their prior employers, FNB of Chicago and Katten Muchin respectively and were scheduled for termination from Datronic. All of this and other key information should have been

26

disclosed in the information statements submitted to the investors of the investment partnerships, to enable these investors to make informed decisions as to their various options. The Torshen and Wolin law firms failed to make such disclosures, despite petitioner's specific request to his own attorneys that such information be addressed.

72. The fraud perpetrators' scheme resulted in major losses for the many thousands of Datronic and CRCA investors and stockholders. The Public Funds lost over $80 million and never saw a penny of the interest guaranteed them by Torshen and Buckley.

73. Outright conversions of funds by the Fraud Perpetrators occurred as a result of their abuse of the Federal Court system and Federal investigative agencies in their quest for unlawful compensations at the expense of more than 35,000 innocent investors including Lopinski.

74. If the Fraud Perpetrators had not succeeded in their fraud on this Honorable Court (and the Court in 92 C 3289), the Public Fund investors would not have been deprived of special protection provisions in their partnership contracts and would have received multi millions of dollars of additional distributions, not including the multi millions of dollars lost from conversions and outright negligence.

75. Additionally, had the fraud on this Honorable Court not occurred, Lopinski would not have been indicted, convicted and sentenced to prison, fined, ordered to pay restitution and accessed supervised release.

76.   These  frauds  were  perpetrated  by  the  conspirators,
which  included  attorneys  who  were  also  "Officers  of  the  Court".
In  consequence  of  the  fraud  on  this  Honorable  Court  alleged
herein,  the  integrity  of  the  judicial  process  has  been  severely
harmed  and  can  be  repaired  only  by  granting  the  full  relief
sought  by  this  Petition.

77.   This  Honorable  Court  has  the  inherent  power  to  vacate
criminal  judgments  entered  herein  and  otherwise  to  fashion
appropriate  remedies,  including  an  order  that  the  funds  currently
being  held  by  these  parties  for  unasserted  claims  as  identified
in  the  SEC  10K's  for  the  investment  partnerships  be  immediately
turned  over  to  the  Court  pending  a  determination  of  rightful
entitlement  by  the  Court.

WHEREFORE,  PETITIONER  PRAYS  THAT  THIS  HONORABLE  COURT  VACATE
THE  CRIMINAL  JUDGMENTS  ENTERED  AGAINST  HIM  IN  THE  CAPTIONED  CASE
BECAUSE  IT  WAS  PROCURED  BY  FRAUD  ON  THE  COURT  AND  GRANT  SUCH
FURTHER  RELIEF  AS  THIS  HONORABLE  COURT  DEEMS  PROPER.

Respectfully  Submitted,

Michael B. Cohen

Michael  B.  Cohen,
Attorney  for  Edmund  J.
Lopinski,  Jr.

Michael  B.  Cohen
Attorney  at  Law
35 E Wacker, Ste. 900
Chicago, IL.  60601
312 726 0739

## Exhibit A

## History of Petitioner's Case

1.  Petitioner was indicted by the Special Grand Jury on March 12, 1997.

2. Petitioner pled not guilty on March 19, 1997 and was arraigned.

3. Petitioner tendered a voluntary acknowledgment and plea on April 7, 1998 concerning Counts 5 and 6 of the indictment. (These counts concerned documents involving the restructuring of a boat and plane transaction. These documents were never completed or executed by the petitioner.

4. Petitioner attempted to withdraw this voluntary acknowledgment and plea on December 14, 1998. This attempt was denied by the Court on June 23, 1999. A Motion to reconsider was denied on August 3, 1999 and an intended loss hearing was scheduled.

5. An intended loss hearing was held on September 28-30, 1999 and on October 14, 1999, this Honorable Court determined petitioner's intended loss to be somewhere between $5 and $10 million.

6. On March 31, 2000, attorneys for the Justice Department filed their motion of Restitution Breakdown with this Honorable Court. This motion claimed that the petitioner owed restitution

to the Investment Partnerships of approximately $4.3 million based on asset purchases totaling approximately $5.4 million. (This motion contained numerous citations to the loss hearing held in the Civil Court in Case No. 92 C 3289, in which a Fraud on the Court is to be charged).

7. Petitioner's attorney challenged the Justice Department's Restitution Breakdown on April 18, 2000. On May 23, 2000, this Honorable Court issued its Judgment that the petitioner owed restitution in the amount of $718,361 based on the asset purchases of approximately $5.3 million. Petitioner was sentenced to an incarceration period of 48 months (subsequently adjusted upward to 63 months) and 36 months of supervised release.

8. Petitioner was since released from incarceration and from his sentence of supervised release.

## CERTIFICATION

Under penalties as provide by law, the undersigned certifies that the statements as set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies that he verily believes the same to be true.

Edmund J. Lopinski, Jr.